UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X

ALICIA MULLICE,                                    Case No.:

             Plaintiff,

    -against-                                    **COMPLAINT**

DELTA AIR LINES, INC. and                          **Trial by Jury Demanded**
DELTA AIR LINES
ADMINISTRATIVE COMMITTEE,

             Defendants.

------------------------------------------------------------------X

       Plaintiff, Alicia Mullice ("Plaintiff" or "Mullice"), by her attorneys the Law Offices of

Rudy A. Dermesropian, LLC, complaining of defendants Delta Air Lines, Inc. ("Delta") and Delta

Air Lines Administrative Committee ("TAC") (collectively referred to as "Defendants"), alleges

as follows:

       1.    This lawsuit seeks to remedy Defendant's intentional creation of a hostile work

environment, unlawful discrimination, harassment, retaliation and unlawful adverse actions

against the Plaintiff based on her disability, perceived disability, race, and age in violation of the

Civil Rights Act of 1866, 42 U.S.C. §1981, as amended by the Civil Rights Act of 1991 ("Section

1981"), Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. §§2000e *et seq*. ("Title

VII"), Americans with Disability Act of 1990, as amended, 42 U.S.C. §12101 *et seq*. ("ADA"),

Age Discrimination Enforcement Act, 29 U.S.C. § 621 *et seq*. ("ADEA"), the Executive Law of

the State of New York, New York State Human Rights Law ("Executive Law"), § 296, *et seq*.,

and the Administrative Code of the City of New York, New York City Human Rights Law

("Administrative Code"), § 8-101, *et seq*.

2.     Plaintiff also brings this action for monetary and equitable relief pursuant to §§ 502(a)(1) and 502(a)(3) of the Employee Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001-1461.

3.     Congress enacted ERISA as a result of several scandals involving employers that mismanaged their employee benefits programs. This mismanagement had inflicted millions of dollars of harm on employees and their dependents. ERISA was designed to put an end to this mismanagement and to protect the interests of employee benefit plan participants. It does so by "establishing standards of conduct, responsibility, and obligation for fiduciaries of employee benefit plans," and by providing plan participants with "appropriate remedies, sanctions, and ready access to the Federal courts" when plan fiduciaries mismanage plan assets. 29 U.S.C. § 1001(b). Courts have referred to ERISA's fiduciary duties as "the highest known to the law."

4.     ERISA subjects anyone with discretionary authority over an employee-benefits plan to fiduciary duties derived from the law of trusts. Most relevant here, ERISA's "duty of prudence" requires fiduciaries to act "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." 29 U.S.C. § 1104(a)(1)(B). Among other things, ERISA's duty of prudence requires plan fiduciaries to make a diligent effort to compare alternative service providers in the marketplace, seek the lowest level of costs for the services to be provided, and continuously monitor plan expenses to ensure that they remain reasonable under the circumstances.

5.     ERISA's fiduciary and procedural provisions demand transparency and fairness. Denying appeal rights or concealing Summary Plan Documents (SPD), particularly in mental-health or Employee Assistance Program ("EAP") cases, converts administrative discretion into

2

actionable fiduciary breach.

6.    29 C.F.R. § 2590.712(c)(4) — Non-Quantitative Treatment Limitations ("NQTLs"), A group health plan may not impose any NQTL on mental health/substance-use disorder (MH/SUD) benefits unless: The processes, strategies, evidentiary standards, or other factors used to apply the limitation to MH/SUD benefits are comparable to, and are applied no more stringently than, those used for medical/surgical benefits in the same classification.

7.    Mandatory EAP participation as a precondition for continued employment for mental-health issues (without a similar medical-surgical requirement) is a NQTL more restrictive than for medical benefits — violating 29 C.F.R. §2590.712(c)(4).

8.    The Department of Transportation (DOT) and Federal Aviation Administration (FAA) regulates mental health for Flight Attendants primarily through requirements for rest periods and provisions for substance abuse.

9.    Plaintiff did not have a Department of Transportation (DOT) positive alcohol or drug screening nor did she refuse to provide a sample for a DOT Substance Abuse Program (SAP).

10.    The SAP process is narrowly triggered: Positive drug/alcohol test; Verified adulterated or substituted specimen; Refusal to test; Employer's reasonable suspicion of drug/alcohol use while on duty. Only after one of those triggers does the SAP process begin. The SAP: Performs evaluation; Recommends treatment; Requires completion documentation; Directs a return-to-duty test; and Communicates findings to the employer.

11.    Employees may contest the findings via FAA enforcement review or employer grievance under labor agreements. The SAP process has structured procedural safeguards and is subject to federal oversight.

12.    Delta's Mandatory EAP Program applied to employees without a DOT violation —

i.e., flight attendants referred for stress, anxiety, interpersonal conflicts, or perceived "unprofessional behavior." Their program has the following: No DOT-triggered testing event; Referral initiated by Human Resources department ("HR") or management, not an SAP evaluator; Referral outcome (fitness or compliance report) affects employment; No internal appeal, grievance, or independent review; EAP vendor (Aetna) transmits compliance data to Delta HR. The program mirrors a safety-compliance structure (like an SAP program) but lacks federal procedural safeguards and ERISA appeal rights

13.     Delta knowingly submitted a Substance Use Disorder (SUD)–style management referral containing 42 C.F.R. Part 2 confidentiality warnings—forms reserved for DOT/SAP drug and alcohol violations—despite Plaintiff having no positive test, no refusal to test, and no substance-related incident. Delta's improper use of a Part 2/SAP referral misclassified Plaintiff's removal from duty for "coworker harassment stressors" as a medical/EAP event, thereby invoking and triggering fiduciary duties under ERISA §§ 404 and 405 to act prudently, transparently, and in accordance with governing plan documents. By issuing a Part 2-based management HIPAA release while simultaneously withholding the EAP Summary Plan Document and its required appeal and grievance rights, Defendants denied Plaintiff the "full and fair review" mandated by ERISA § 503. The inconsistency between Delta's Part 2-styled referral and Aetna's non-Part 2 processing constitutes a material procedural irregularity, evidencing fiduciary misrepresentation, failure to monitor co-fiduciaries, and a deliberate effort to mislead Plaintiff regarding her rights under the Plan.

14.     Plaintiff's ERISA claims involve failure to adhere to Mental Health Parity and Addiction Equity Act (MHPAEA), concealment of benefits, appeal opportunity to employees similarly situated to Plaintiff, and compelling participation in a Fitness for Duty Exam for mental

health issues/workplace disciplinary problems.

15.  Over the past several years, Defendants breached their fiduciary duties and mismanaged Delta mandatory EAP program and appeal rights, costing their employees, like Plaintiff, significant amounts, paying for EAP covered therapy session, and benefits.  Defendants' mismanagement is most evident in (but not limited to) the concealment of employees' full and fair review or appeal rights, and compelling employees to pay for EAP covered therapy session out-of-pocket.

## PARTIES

16.  Plaintiff, a Black woman, was an employee of Defendant Delta and assigned to Delta's John F. Kennedy Flight Attendant base and remained there until her constructive discharge.

17.  Plaintiff is a covered "employee" and "person" within the meaning of Section 1981, Title VII, the ADA, the ADEA, the Executive law § 292(6), and the Administrative Code §8-102(1).

18.  At all relevant times, Plaintiff has been a "participant" in the ERISA plans at issue here, within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). She began employment with Delta on July 17, 1999, as a Flight Attendant in Atlanta, GA, until her constructive discharge effective December 2, 2022. Plaintiff brings this lawsuit as a whistleblower to bring to light Defendant's mismanagement of the ERISA plans at issue here as a result of Defendant's fiduciary breaches.

19.  Defendant Delta is a major airline company headquartered in Atlanta, Georgia, operating multiple hubs, including its primary transatlantic hub at JFK International Airport in Queens, New York.

20.  Upon information and belief, with its regional subsidiaries and contractors operating under the brand name Delta Connection, Delta has over 5,400 flights daily and serves 325

destinations in 52 countries on six continents. It is the second-oldest operating commercial airline in the U.S.

21.    Upon information and belief, Delta ranks first in revenue among the world's largest airlines.

22.    Defendant Delta is a covered "employer" within the meaning of Section 1981, Title VII, the ADA, the ADEA, the Executive law § 292(5), and the Administrative Code §8-102(5).

23.    Defendant TAC is the administrator of the Plans and a fiduciary of the Plans with general authority for the management and administration of the Plans.

24.    TAC under ERISA is the fiduciary body responsible for overseeing and administering Delta's employee benefit plans, such as the EAP plan. As a fiduciary under ERISA, the committee has a duty to act prudently and solely in the best interests of plan participants and beneficiaries.

25.    Upon information and belief, this has led to numerous lawsuits against Defendants, often class-action, alleging the committee has breached its fiduciary duty by failing to provide low-cost investment options or making other decisions that harm plan participants, such as those related to actuarial assumptions for pensions.

## JURISDICTION AND VENUE

26.    This Court has subject matter jurisdiction with respect to Plaintiff's federal claims pursuant to 28 U.S.C. §§ 1331 & 1343, 42 U.S.C. §1981, 42 U.S.C. §§2000e *et seq*., 42 U.S.C. §12101 *et seq*., 29 U.S.C. § 621 *et seq*. pursuant to §§ 502(e) and (f) and 29 U.S.C. §§ 1132(e) and (f).

27.    Unlawful employment practices relevant to this action were committed in the Eastern District of New York.

28.    This Court has original subject matter jurisdiction over the instant action pursuant to

28 U.S.C. § 1331, as this action arises under the laws of the United States.

29.  This Court has supplemental jurisdiction over Plaintiff's New York State and New York City claims pursuant to 28 U.S.C. § 1367(a).  The New York State and New York City claims are inexorably related to, arise out of the same operative facts and circumstances as, and are a necessary, integral part of the federal law claims, such that the federal claims and New York State and New York City claims form part of the same case or controversy.

30.  Venue is proper in this Court pursuant to 28 U.S.C. §§ 1391(b)(1) & (2).

31.  On Auguste 26, 2025 the U.S. Equal Employment Opportunity Commission, New York District Office ("EEOC") [Charge No. 16G-2023-00375] terminated its processing of Plaintiff's charge and issued a Notice of Right to Sue. This action was filed within 90 days of Plaintiff's receipt of the Notice of Right to Sue. Annexed hereto as Exhibit A, and incorporated in this Complaint by reference, is a copy of the EEOC Notice of Rights.

## FACTS

### *General Background*

32.  On or about July 17, 1999, Plaintiff began her employment with Defendant Delta as a Flight Attendant in Atlanta, GA.

33.  In or about February 2001, Plaintiff transferred bases to Defendant's In-Flight Services ("IFS") NYC Flight Attendant base in Newark NJ, until that base closed in November 2020, at which time she was transferred to Delta's John F. Kennedy ("JFK") Flight Attendant base and remained there until her constructive discharge on December 2, 2022.

34.  In or around 2001 Plaintiff was promoted to Purser and Coordinator. A Purser on an airline is a Flight Attendant who serves as the leader of the cabin crew, overseeing their duties, ensuring passenger safety and comfort, managing service standards, and handling administrative

tasks. Pursers are responsible for coordinating with the flight deck, conducting pre-flight checks, managing the cabin environment, and liaising with passengers, especially in premium classes. This role requires specialized training, experience, and is often awarded based on performance and seniority within the cabin crew.

35.    During her 20-year career with Delta, Plaintiff would also coach, mentor and encourage Flight Attendants to pursue charter opportunities, and would create various guidelines and share it with charter Flight Attendants and other Flight Attendants assigned charters to ensure the customers received Delta renowned legendary service.

36.    Plaintiff was also selected as a Charter Flight Attendant in various capacities at Delta.

37.    Plaintiff also held the primary flight leader position on a dedicated charter for seven years from April 2010 until January 2018 and was the only African American dedicated sports charter flight leader in Delta's IFS NYC Flight Attendant base.

38.    As a member of the dedicated VIP charter pool, Plaintiff would bid on the trips and be awarded them based on system seniority and preference.  These trips would be constructed to sign in and end in one of Delta's Flight Attendant bases.

39.    In 2012, Plaintiff was selected and joined a Harmon Services LLC sports charter pool and remained in the pool until her constructive discharge in 2022.  Plaintiff was a member of this pool in Delta's NYC IFS Base and would generally sign in and end trips in NYC.

40.    Plaintiff was instrumental in ensuring that Flight Attendants in this sports charter pool received a system wide seniority list monthly to assist with their bidding.

41.    Plaintiff also recommended a policy to Defendant Delta managers, that was adopted, to ensure compliance with Harmon Services LLC (Harmon) COVID testing  policies.

42.    Caucasian members of the Harmon Pool would often share their displeasure that the

composition of the flight attendants in the group were majority African American.

43.   For example, on June 6, 2022, a Caucasian Flight Attendant, who was a member of the IFS Employee Involvement Group (EIG), stated to Plaintiff that it was a "Black Pool" and that Defendant Delta General Manager of IFS Strategic Programs did not like its Black racial composition.

44.   Similar comments were heard by Plaintiff and others for the entirety of Plaintiff's 10-year tenure in the sports charter pool.

45.   Plaintiff complained and protested these racially infused and discriminatory comments and of Delta's policies allowing a racial and discriminatory environment to persist on the job. However, no intervention or remedial action was taken by Delta.

46.   In August 2021, Plaintiff was selected as a Flight Leader for Defendant Delta's first ever dedicated concert tour charter that did not operate per a system seniority bidding system.  This selection caused Plaintiff to suffer higher scrutiny racial/gender discrimination and harassment from coworkers and Delta managers.

*Disability Discrimination*

47.   Plaintiff had a pre-approved Family Medical Leave Act ("FMLA") since 2016 through Sedgwick, which offers benefits administration solutions to support care and compliance across absence management, employee disability, travel and medical, and more.

48.   Plaintiff's approved FMLA allows her to take up to three (3) trips off per month due to the severe migraines she suffers from.

49.   However, in or around November 11, 2021, Plaintiff used one of her pre-approved FMLA days.

50.   However, in an obvious attempt to discriminate against Plaintiff due to her known

and documented disability, Delta accused Plaintiff of committing fraud against the company for using a pre-approved FMLA day due to severe migraines.

51.    Delta negligently performed an FMLA disability fraud investigation that allowed Plaintiff to be harassed and stalked via the Flight Attendant database management system ("DBMS") and non-revenue passes (i.e., free flight benefits) by supervisory members of Delta's Scheduling Department.  As a member of Delta Scheduling department, employees have reservation skills to book Flight Attendants on flights as full fare paying passengers and can access what flights they're booked on using their free flight benefits.

52.    Delta agent Gayland Mitchell ("Mitchell") admitted to Plaintiff in February 2022 accessing Delta IFS Scheduling Department systems to track her working flight movements, and sent Plaintiff a screenshot of tracking the flight Plaintiff was currently on in real time.  This is an admission of abusing and misuse of Delta technology systems to track Plaintiff.

53.    These statements and actions caused Plaintiff to face emotional turmoil but was powerless to stop the actions due to Delta agent Mitchell's leadership position and access to Delta's flight attendant DBMS systems.

54.    Delta agent Mitchell pulled Plaintiff's location via text message on August 6, 2022, without her knowledge or permission.  When Plaintiff complained and asked "how he was able to do that?"  Mitchell ignored her complaints.

55.    On the afternoon of August 7, 2022, as Plaintiff  was attempting to utilize her free flight passes, she was abruptly blocked.  When she navigated to the Employee TravelNet page, it stated to contact a member of Delta HR and that she could not use the benefit. No other non-Black Flight Attendant was subjected to this form of retaliation by Delta.

56.    Plaintiff complained to Delta HR professionals in August 2022 about the harassment

by other employees through the free flight benefits and the retaliatory action of blocking her free flight benefit. However, Delta HR professionals never investigated Plaintiff's complaints or asked any questions in regards to the complaints.

57. Defendant Delta agents in the IFS Scheduling Department would frequently call Plaintiff from the end of 2021 until July 2022 and state "I see you called in FMLA today. How's your Mom doing?" implying that Plaintiff was somehow using her FMLA for reasons unrelated to her migraines, which is not true.

### *Acts of Harassment and Discrimination*

58. In 2017, as the only African American Flight Leader (FL) for a dedicated sports team in Delta NYC IFS Base , while trying to fulfill company policies as part of her responsibilities, Plaintiff was met with increasing resistance and targeted treatment by non-Black crew members. As a result, in September 2017, Plaintiff made the difficult decision to leave the position in order to remove herself from a harassing and hostile work environment. This was in part the challenges she started to face as the first African American FL in the IFS NYC Base.

59. Per Delta IFS Procedures Charter Chapter, Plaintiff's duties included the following: Flight Leader (FL)/Purser Responsibilities FL/Purser must obtain the necessary paperwork, retrieve the charter menu from the IFS Portal and brief with the crew. FL/Purser is responsible for checking catering, supplies, and ensuring compliance with the standards of service and safety. The FL/Purser will closely coordinate all phases of the flight with the Charter Coordinator. Once the rotation is completed, the FL/Purser is required to record all pertinent information into facts.

60. In June 2019, after returning to work following an on-the-job injury to her knee, Plaintiff realized that she would be working with many of the same crew members who created the hostile and harassing environment in 2017, which is why. she made the conscious decision to

limit non-work related interactions with these crew members, assuming a more reserve yet still professional demeanor.  Plaintiff also had to change scheduled working shifts to avoid working with these crew members.

61.    For almost two years, Plaintiff continued to limit her interactions with these crew members while working to build a positive reputation as a reliable team member, giving excellence service to customers.

62.    During this time, specific crew members from Plaintiff's time as the only African American FL of a dedicated sports team in Defendant Delta's NYC IFS Base, continued their harassing and bullying behavior.  In addition, their behavior had infected Plaintiff's  interactions with other Delta agents who weren't part of the initial problem.

63.    In addition, starting in or about 2020-2021, Caucasian Flight Attendants were writing up Harmon sports crew members, who were predominantly Black, but not members of another charter customer whose members were predominately Caucasian, when both groups exhibited the same behavior.  Plaintiff was told repeatedly by Delta personnel that the predominately Caucasian charter customers were "good boys".

64.    Delta agent Jeff Bernston ("Bernston") was also the planner for another dedicated sports charter for which Plaintiff was an alternate in 2020 through 2022.  Bernston as a part of his duties as the planner, would meet with charter team representatives to reorder the list then give the names to IFS Strategic Programs (IFS Charters).  However, as a form of retaliation and continued harassment, Plaintiff's ranking on that charter would drop in an accelerated fashion for undisclosed and unidentified reasons.

65.    Plaintiff complained to Delta IFS Charters in August 2020 regarding the change in her ranking on the dedicated team Bernston was the planner.

66.   Plaintiff shared how her name continued to drop with various Flight Attendants in August 2021, and subsequently in February 2022, she was compelled to remove herself from the list to stop the sustained harassment, retaliation and hostile actions of Defendant Delta agent Bernston.

67.   On or about May 29, 2022, another Defendant Delta Flight Attendant Belinda Bynes ("Byrnes") posted in a Facebook group Harmon Charter Flight Attendants a statement targeting Plaintiff stating in part, "WHY is it Soooo Hard for some people to say Good Morning to the crew??? And to make matters Worse when they are the A…" (i.e., the Flight Leader), to which another Flight Attendant, Jodi Alvarez ("Alvarez") responded, "I know EXACTLY what you're talking about." That group consisted of over 400 members, including Defendant Delta agent t Eric Young ("Young"), General Manager in Delta's Network Planning, Charter Coordinators and fellow crewmembers based throughout Defendant Delta's Flight Attendant bases.  Young was aware of the post as he was an active participant in the group and did nothing to remediate it per Delta's Internal EEO policies.

68.   At the time of the post, Plaintiff had deactivated her Facebook profile. This knowledge was known by members of Delta Harmon sports charter pool and members of the dedicated concert crew members.  However, when she reactivated her Facebook on or about June 18, 2022, and gained actual knowledge of the social media bullying against her, that post had been up for twenty days without any remediation on behalf of Defendant Delta or its agents who were aware of it.

69.   In fact, the social media bullying post remained in excess of 60 days and Defendant Delta failed to take any action of remediation.  The post was in violation of Delta's social media policy and Employee Code of Conduct.

70.    Immediately after Plaintiff gained knowledge of the bullying and harassing post, she complained about the constant harassment, hostile work environment, and retaliation she was being subjected to, stating in part "I'm not asking people to choose sides, but when people refuse to see what I'm dealing with it's appalling."   Plaintiff shared these bullying and harassing concerns with two flight attendant coworkers via text, made it part of her EEO complaint on July 18, 2022 and her complaint to HR on August 3, 2022. In her complaint to HR, Plaintiff reminded Delta of the ongoing harassment, discrimination, hostility and retaliation she has been subjected to for the last few years as briefly discussed above.

71.    On July 15, 2022, Plaintiff had an in-person meeting with Defendant Delta agent Young where she again complained of the ongoing harassment and hostility, and the names of two of the  main harassers, who are Caucasian flight attendants, was bought up, including one who commented on the Facebook post Plaintiff saw on June 18, 2022.

72.    One of the harassers,  Delta agent a Caucasian flight attendant, Alverez, had yelled at Plaintiff on March 15, 2022, that "no one likes you" on a trip they worked together.  Plaintiff complained to Defendant Delta agent Young since he was already aware of the Facebook post and failure to remediate it.   Young replied to Plaintiff's complaint stating that her Caucasian co-workers who are harassing Plaintiff ,  "are good girls, right?"

73.    Defendant Delta agent Young also repeatedly made reference to a derogatory "Second Class Citizen" comment when referring to certain Black Flight Attendants. That comment had been permeating throughout the Delta Charter group.

74.    Plaintiff repeatedly opposed and objected to the use of that derogatory and racist comment, and made it clear that she did not want anything to do with the "Second Class Citizen" comment and wanted to be left out of it.

14

75.   Plaintiff, as well as other Black employees, have been met with reference to being a "Second Class Citizen" by Delta agent Young.  For example, in a text exchange on June 18, 2022, Delta agent Young stated, "the leading Second Class Citizen was Yolanda, correct."    Delta Defendant agent Young was referring to Yolanda Lynch, an African American woman Employee, who was a crew member on the dedicated concert tour Plaintiff was the FL on from October 2021 until December 2021.

76.   The same way that Black employees at Delta were openly referred to as "Second Class Citizens," Black employees, during Plaintiff's employment were referred to as "rats." For example, on June 9, 2020, via an e-mail exchange with Delta former VP of IFS Allison Ausband ("Ausband"), where former Chief People Officer Joanne D. Smith was copied, African Americans were referred to as "rats" by a Caucasian former Delta Flight Attendant Kevin Lee Jennings ("Jennings").  This type of racist culture and environment was allowed and even encouraged by Delta considering that no permanent remedial actions have been or are being taken by Defendants.

77.   As a result of the foregoing harassment and bullying, on July 18, 2022, Plaintiff filed an internal Equal Employment Opportunity ("EEO") complaint about co-worker harassment and managerial misconduct.

78.   On July 19, 2022, Plaintiff resubmitted her EEO complaint with additional information.

79.   On July 18 and again on July 19, 2022, Plaintiff was contacted by supervisory intermediaries of the named managers, at which time she reiterated her complaints.

80.   It was also uncovered that Plaintiff's confidential internal EEO complaint was being shared with other employees.  These actions were contrary to Delta's corporate policy which states in part:  "All complaints of discrimination, harassment or retaliation will be investigated. Due to

the sensitive nature of such complaints, investigations will be as discreet as circumstances permit. Information concerning such investigations will be communicated only to those who need to know such information.  If you are a leader and you are aware of behavior that may violate this Policy, it is your responsibility to stop the behavior and promptly and proactively investigate the matter and, if substantiated, to take appropriate steps to prevent it from occurring again in the future.  This includes investigating information about potential violations. When Delta confirms that a violation of this Policy has occurred, it will take appropriate action intended to prevent the conduct from reoccurring. In some cases, this may include corrective action up to and including termination. To protect the confidentiality of all those involved, although Delta will inform the reporting employee of the status of his or her complaint, the specific outcome and action taken may not be shared."

81.   As a direct result of the ongoing harassment, bullying and hostility, on July 26, 2022, Plaintiff sought the assistance of a psychiatrist to deal with the discrimination, harassment, retaliation, humiliation, and reputational harm, which resulted in mental anguish that Defendant Delta had allowed to continue and even encouraged with their non-action or failure to act.

82.   On August 3, 2022, during a meeting with Delta agent IFS Base Manager Carla Bourdier ("Bourdier") and Juan Diaz ("Diaz"), Delta NYC IFS Base Leader, to address in part Plaintiff's internal EEO complaint, Plaintiff was pressured for over an hour, without the presence of an HR representative, to withdraw her EEO complaint so it can be handled in an informal manner.

83.   In order to persuade Plaintiff to withdraw her former EEO complaint, Diaz repeatedly asked her "what it would take to get [her] back on a Charter Flight."  Plaintiff made it clear that she was unable to return to Charter planes due to the harassment and hostility she was subjected to.

84. In August 2022, approximately 26 days after the internal EEO complaint and contemporaneous with the mandatory EAP referral discussed below, Defendant retaliated against Plaintiff, where Delta's HR accused Plaintiff of boarding a charter flight to a military installation adjacent to stealth aircraft without proper authorization by Defendant Delta agent Young.

85. However, despite documented proof to the contrary, which Plaintiff submitted to Delta, HR did not dismiss these false accusations.

86. In fact, the false accusation caused significant professional and emotional harm to Plaintiff, and was used to justify intensified monitoring, continued Mandatory EAP sessions, and suspension from work.

87. Delta Leadership's failure to address that false accusation added to Plaintiff's emotional anguish that culminated in her mental health being impacted.

88. Plaintiff took diligent efforts to obtain Short Term Disability ("STD") information from Defendant Delta to deal with the toll the harassment, hostile work environment and retaliation she had faced. Specifically, Plaintiff contacted FSM Justice on July 27 and July 29, 2022 requesting information about filing for STD. However, FSM Justice never provided the requested information or assistance in filing for it.

89. Without the help from Delta to apply for STD, Plaintiff was forced to take Manage Time Outs ("MTO") on July 27 and July 30, 2022, pursuant to Delta's policies.

90. Furthermore, on August 5, 2022, only 48 days after seeing the bullying and harassing comments on social media and 18 days after submitting her internal EEO complaint, Defendant placed Plaintiff on a mandatory EAP, as a further attempt to retaliate and harass Plaintiff.

91. Defendant Delta's Mandatory EAP Program is a 12-week program, which has mandated job requirements designations and a Return to Duty Fitness Exam. The referral was

facilitated by Defendant Delta agent FSM Justice.

92.   The mandatory EAP referral requested that Plaintiff unnecessarily release Protected Health Information (PHI) to eleven different departments/entities in and outside of Delta for the prior year, which is also seen and interpreted as a form of retaliation and harassment.

93.   In fact, Delta mandated Plaintiff's participation in the EAP without demonstrating that such mandate was job-related and/or consistent with business necessity.

94.   Feeling compelled to do so, Plaintiff signed the Management Referral Form and Authorization for the Release of Information ("ROI") with a representative Marci Stafford ("Stafford") of Aetna RFL.

95.   However, Defendants do not provide Plaintiff with any opportunity or process to appeal or challenge the EAP referral or findings on the referral forms.

96.   Plaintiff was then instructed to file for STD with Sedgwick after completing the intake with Aetna RFL, which she complied with.

97.   Plaintiff is placed on Mandatory EAP and STD concurrently, but her schedule reflects CFSM, which is a code in Delta DBMS scheduling system for a flight attendant to contact their field service manager.  This is a code placed on a Flight Attendant schedule when their subject to performance development.  The only way a flight attendant's schedule can be cleared of a CFSM, is to talk with a Delta IFS Supervisor or HR.

98.   On October 3, 2022, Plaintiff had a Webex meeting with Terrance Jackson ("Jackson"), General Manager of HR, and Sarah Hill ("Hill"), HR Representative. During the virtual meeting, Plaintiff reiterated her complaints listed in the July 2022 EEO complaint pertaining to discrimination and hostile work environment.  Plaintiff had discovered that Delta had secretly opened EEO and FMLA investigations, close in time to reporting coworker harassment.

HR's pre-existing, undisclosed investigations demonstrate continued discriminatory animus and a retaliatory effort to discredit and remove Plaintiff for engaging in protected activity.

99.    Also, on or about October 19, 2022, Plaintiff had a second Webex meeting with Jackson and Hill, where she again complained of discrimination.  Plaintiff also made Delta's HR professionals aware in the meeting that Andrea Misserian IFS Northeast Region Director ("Misserian") had overruled a Delta HR professionals finding of cyberbullying that had a 36-month corrective action notice issued to another Flight Attendant, which is the exact same harassment Plaintiff was facing that caused her to submit her internal EEO complaint, which shows that Delta is failing at or refusing to remediate the common bullying, which impacts Plaintiff.

100.    However, while on the mandatory EAP, Plaintiff's flight benefits and privileges as a Delta Flight Attendant were stripped away.

101.    While on the Mandatory EAP, Plaintiff was subjected to multiple mandatory mental health therapy and psychiatry sessions starting from August 2022 until December 2022.

102.    Plaintiff's  Mandatory EAP Counselor Curtis Gilreath, LCSW ("Gilreath") on August 9, 2022, in a text exchange requested a copy of her private health insurance card.  Plaintiff complied by sending a copy of her insurance card on August 11, 2022, hours prior to commencing the Mandatory EAP sessions.

103.    Plaintiff completed Delta's Mandatory EAP program on October 19, 2022, but was not told it is completed, which is why she spoke with Aetna agent Stafford on October 25, 2022, and sought clarification on what is required of her to be in compliance with the Mandatory EAP.

104.    Plaintiff was instructed to contact Aetna provider Gilreath and to follow his clinical recommendations ensuring she remained in compliance with Delta's Mandatory EAP referral. Gilreath Return To Duty recommendation was to continue having session at her own expense in

order to comply with the Mandatory EAP. Gilreath recommendations are similar to SAP recommendations for an employee who has failed a DOT alcohol/drug test or refused to test.

105. Plaintiff saw Gilreath on October 27, 2022, and received an Explanation of Benefits (EOB) for care dated November 1, 2022, from United Healthcare.

106. On November 3, 2022, Plaintiff was informed that Aetna was no longer paying for her sessions, and that she needed to complete certain insurance forms for medical billing payments for continued mandated employer sessions.

107. Employees are not to pay for Mandatory EAP visits via a Management Referral as terms and conditions of employment. Atena shifted the cost of a compulsory ERISA plan process from the employer to the employee, contrary to ERISA's fiduciary requirements and disclosures.

108. However, on November 21, 2022, after a virtual meeting with a member of Defendant Delta's Employee Engagement Division, Plaintiff was offered 12 free voluntary EAP visits, which she accepted because of the emotional distress she continued to be subject to. Plaintiff complained again of harassment and discrimination. Sharing with tears in her eyes, "It's too late for me, I'm Black." At this point Plaintiff had been subjected to (a) forced compliance with mental health sessions, (b) multiple meetings with HR, (c) being told to maintain employment she must pay for mental health counseling and (d) concurrent investigations that had continued with no resolution for over five months,

109. Delta also placed Plaintiff on its No Fly List on August 7, 2022, as a part of the Mandatory EAP referral. On July 14, 2024, Delta denied her boarding on a Delta flight from West Palm Beach FL to Atlanta GA allowing her name to remain on the list even after her constructive discharge.

110. Delta had placed Plaintiff on an internal security watchlist, also known as Delta's

"Internal No-Fly List," branding her effectively as a person barred from riding on any Delta flights even as a passenger. This extraordinary measure is typically reserved for individuals who might pose a safety or security threat to the public, the airline or crewmembers. Defendant Delta flew 240 million passengers in 2024 and maintains a list of approximately 2000 passengers on its internal No Fly List.

111. In August 2024, Plaintiff requested and received the August 2022 mandatory EAP referral from Aetna Resources for Living, and it uncovered that Plaintiff was suspended from work for stressors from her co-worker harassing her.

112. FSM Justice notation within Plaintiff's personnel file stating that she was "suspended due to stressors from coworker harassment" demonstrates knowledge of an adverse employment action originated from known workplace-harassment conditions rather than a legitimate medical-fitness determination. The referral was administered through the employer's self-insured welfare plan and its third-party fiduciaries, including Aetna Resources for Living and Sedgwick Claims Management Services. Thereby categorizing Plaintiff's employment status as "medical leave" rather than "suspension." This maneuver transferred the administrative control of Plaintiff's absence from Delta HR to the plan administrators, creating a layer of procedural opacity.

113. By processing the suspension through an ERISA-governed EAP pathway, Defendants reclassified a disciplinary action arising from coworker harassment into a purported "medical" or "fitness-for-duty" matter. In doing so, Defendants invoked ERISA plan administration without providing Plaintiff the procedural protections guaranteed by 29 U.S.C. § 1133 (ERISA § 503) or the fiduciary duties imposed by 29 U.S.C. § 1104(a) (ERISA § 404). Plaintiff was not provided plan documents or notice of review procedures as required by regulation

114. The purpose of this adverse and punitive action against Plaintiff was concealed from

her by Delta, Aetna, Sedgwick and the implications of the suspension on employee benefits, and terms and conditions of employment.

115. That concealment had multiple implications. For instance, it denied Plaintiff the opportunity to contest the suspension or to invoke any internal grievance procedures associated with a disciplinary suspension, it obscured the impact on job status and benefits, Plaintiff was placed on Defendant Delta's Internal No Fly List, she lost non-revenue flight benefits, was not allowed due process, and was denied access to the EAP Summary Plan Document.

116. Due to Plaintiff's suspension from work, Delta HR internal policies subjected her to a Review For Continued Employment (RFCE) or Hold Category. The RFCE category means any employee that either had been suspended or was subject to a suspension was being reviewed for separation for the company. The Hold Category means any employee that might be out on a leave, anyone that may be on vacation, off work for whatever reason or whatever direction was provided to hold on speaking to that individual or investigating a particular case for various reasons.

117. The contacts Plaintiff received from HR in August and September 2022 to participate in investigations were against their own internal policies.

118. The evidence establishes a unified course of conduct in which Defendants (a) acknowledged coworker harassment as the precipitating stressor; (b) suspended Plaintiff rather than addressing the harassment; (c) continued the concurrent disability fraud investigation and EEO investigation (d) reclassified the suspension as a health-related event to invoke ERISA plan procedures; and (d) failed to disclose or honor appeal and grievance rights under either employment or benefit-plan frameworks.

119. In fact, Plaintiff has actual and direct knowledge that Delta did not suspend Caucasian and non-Black younger Flight Attendants from work via a Mandatory EAP placement, who had

been the victims of social media bullying or other forms of harassment. Those Caucasian or non-Black younger Flight Attendant victims, like Ibis Obando, were allowed to remain at work while an investigation was conducted and were not forced to resign their position.

120. In addition, similarly situated employees who are Caucasian male and younger than Plaintiff are permitted to retain their non-revenue travel privileges, despite being under comparable safety-related scrutiny.

121. Delta's willful concealment of the suspension denied Plaintiff the opportunity to interview for a VIP opportunity in October 2022 despite other similarly situated Flight Attendants on STD, who missed the deadline of September 16, 2022, were allowed to interview.

122. Delta also removed Plaintiff from contention as a finalist for the Chairmans Club Award 2022 as discussed above.

123. On September 11, 2024, Jackson, Director of Delta's HR, stated that Plaintiff's 's Mandatory EAP was predicated upon concerns of IFS Leadership. Jackson stated in part: Delta started the Mandatory EAP referral process in early August 2022, following concerns reported by IFS leaders.

124. In May 2025, Plaintiff requested to appeal and grieve the Mandatory EAP placement from 2022 and was told by Jackson that there is no grievance or appeals process associated with Delta's EAP program.

125. In September 2025, Plaintiff received Delta's EAP SPD and it contained a detailed appeal and grievance policy, which a change in policies following Plaintiff's forced resignation and contradictory to what Jackson and Delta had previously informed Plaintiff.

### *Failure to Accommodate*

126. Three days after writing the internal EEO complaint, Plaintiff worked a trip on July

21, 2022, and started crying on the jump seat due to the humiliation, public ridicule of the social media bullying and the sustained harassment she had been subjected to by Delta.

127. Plaintiff  sent text messages to Bourdier and requested an MTO for her trip on July 22, 2022.  Bourdier had a duty to engage in the interactive process upon actual knowledge of Plaintiff was crying at work from the social media bullying post and internal EEO complaint, which she failed to do.

128. At no time did a member of Delta IFS Leadership attempt to engage in the interactive process, rather they concealed a suspension from work via a Mandatory EAP placement.

129. During the August 3, 2022, meeting Plaintiff was told by Bourdier "to get her head together before coming back into the office."  This statement shows discriminatory animus to Plaintiff and a willful disregard to the required interactive process.

130. Plaintiff repeatedly sought voluntary EAP services on July 18, 2022, she called the EAP phone number from Delta's Intranet and had a 13 minute phone call.  Plaintiff voluntary EAP referral was never honored due a failure in Defendant Delta and Aetna internal policies.

131. On October 14, 2022, Delta's Aetna RFL, agent Gilreath, texted Plaintiff and initiated discussion regarding possible workplace accommodations in connection with  participation in Delta's EAP.

132. Delta's Aetna RFL, agent Gilreath, represented that he would "discuss possible accommodations" for Plaintiff. However, because Aetna functioned solely as a third-party administrator and vendor of EAP services, it had no authority to evaluate or implement workplace accommodations.

133. Delta's internal policies state such request should have been initiated by Delta's EEO Department or the Accommodations Team.

134. However, neither Delta's HR nor EEO personnel initiated any interactive process or formal review of Plaintiff's request for accommodation from July 2022 until December 2022 when Plaintiff was constructively discharged.

135. Furthermore, in or about June 2022, Plaintiff suffered dermatologic and stress-related symptoms as a result of Delta's purple uniform, which she was required to wear.

136. The purple uniform consisted of a Delta's signature dress, a V-neck dress, an apron, a sweater, a scarf, and a raincoat.

137. Plaintiff wore the Uniform while on duty from on or about 2018 until 2022, and generally over 15 hours per day.

138. The uniform was in direct contact to Plaintiff's skin from her neck all the way down to the knees, except of the areas covered by pantyhose and underwear.

139. As a proximate result of wearing the uniforms, Plaintiff suffered dermatologic and stress-related symptoms prompting her to request an accommodation.

140. Between November 23 and December 5, 2022, Plaintiff received a series of calls from Delta's Uniform Team, including Kim Pierce and other representatives, regarding completion of the company's Uniform Accommodation paperwork.

141. Plaintiff timely submitted the completed Uniform Accommodation forms to Delta's Accommodations Department by e-mail on December 9, 2022, which were acknowledged on the same day.

142. However, despite Plaintiff's ongoing participation in treatment and the pending accommodation process, no Delta official engaged in the required "interactive process" to determine reasonable accommodations or facilitate a safe return to work.

*Constructive Discharge*

143. Plaintiff's pay was impacted due to filing of the internal EEO complaint on July 18, 2022, taking Plaintiff's MTO on August 12, 2022, and her paycheck that covered the weeks of July 23, 2022 and August 5, 2022, was for $0.

144. Plaintiff received No Pay for 30 Days forcing her to withdraw funds from her 401k.

145. Plaintiff did not receive a final wage statement or an accounting of weeks of vacation and Personal Paid Time (PPT) owed and if they were paid. Plaintiff had a week of earned vacation in August 2022 that was removed from her schedule and returned to Defendant Delta's vacation bank. The returning of this week required an accounting and payment of wages.

146. While complying with Defendant Delta's directives and continue treatment, Plaintiff notified Sedgwick Claims Management Services, Delta's third-party disability administrator, through its internal chat function on December 8, 2022, that she had scheduled an in-person psychiatric evaluation for December 14, 2022. Sedgwick examiner Isabel S. responded, "Thank you for the updates!" This response constitutes notice to Delta, through its agent, that Plaintiff remained under treatment for a mental-health condition related to workplace stress, had not been released to return to duty, and lacked full capacity to make voluntary employment decisions

147. Plaintiff received a full schedule for December 2022, which was the end of her STD leave. Neither Defendant Delta's HR nor the EEO department contacted Plaintiff regarding any return-to-work provisions. They failed to notify Plaintiff if she was off Mandatory EAP or the findings of the EEO investigation.

148. Despite ongoing treatment and active communication with Delta's Accommodations Department, and since Delta failed and/or refused to accommodate Plaintiff, she submitted and rescinded two resignations during December 2022, reflecting continued distress and confusion

26

amid a lack of employer guidance. Delta took no steps to pause or clarify her employment status, failed to communicate to her about her ability to return to work, or to evaluate whether continued employment with accommodation was feasible.

149. Defendant never engaged in any interactive process or offered any reasonable accommodation for any of Plaintiff's disabilities or conditions.

150. On December 12, 2022, Melissa Seppings, Delta's Director of HR Equal Opportunity and Compliance, e-mailed Plaintiff, stating that Delta had accepted Plaintiff's "resignation" dated December 2, 2022, and instructed Plaintiff to contact the EEO Department to appeal that acceptance.

151. When Plaintiff attempted to appeal the acceptance, she found the EEO Department's online form inoperative.

152. Subsequent communications from Misserian and Delta's HR personnel provided no assistance, confirming that Delta viewed Plaintiff as separated from employment despite having a disability, pending accommodation request, and attempted rescission.

153. Defendant's adverse actions were clearly targeted against Plaintiff, were malicious and intentional.

154. As a direct and proximately result of Defendant's actions and inactions, Plaintiff has suffered, and continues to suffer, significant economic, career, reputational and emotional harm.

155. As a result of Defendant's discriminatory, retaliatory, harassing and hostile conduct, Plaintiff suffered, and continues to suffer, among other things, mental anguish, emotional distress, loss of enjoyment of life, stress, anxiety, depression, and other monetary damages connected with Defendant's aforementioned violations.

156.    Amid ongoing harassment, discrimination, and hostility, Plaintiff's July 26, 2022, diagnosis of Adjustment Disorder with anxiety and mixed depression deteriorated into Bipolar 1 Disorder by November 2022, a diagnosis reaffirmed in January 2023 and for which she has remained in continuous treatment.

## AS AND FOR A FIRST CAUSE OF ACTION
### Race Discrimination in Violation of Section 1981

157.    Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

158.    Defendant violated Section 1981 by engaging in, perpetuating and permitting supervisory and decision-making managers and employees to engage in discriminatory employment practices in which Plaintiff's race was the motivating, if not the only factor.

159.    As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

160.    Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A SECOND CAUSE OF ACTION
### Race Discrimination in Violation of Title VII

161.    Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

162.    Defendant violated Title VII by engaging in, perpetuating and permitting supervisory and decision-making managers and employees to engage in discriminatory employment practices in which Plaintiff's race was the motivating, if not the only factor.

163.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

164. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

**AS AND FOR A THIRD CAUSE OF ACTION**
**Race Discrimination in Violation of Executive Law § 296, *et seq*.**

165.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

166. Defendant violated the Executive Law § 296, *et seq.*, by engaging in, perpetuating and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's race was the motivating, if not the only factor.

167.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

168. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

169.  As a result of the outrageous and blatantly discriminatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

**AS AND FOR A FOURTH CAUSE OF ACTION**
**Race Discrimination in Violation of the Administrative Code § 8-107, *et seq*.**

170.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth

herein.

171.  Defendant violated Administrative Code § 8-107, *et seq*. by engaging in, perpetuating and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's race was the motivating, if not the only factor.

172.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

173.  Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

174.  As a result of the outrageous and blatantly discriminatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

## AS AND FOR A FIFTH CAUSE OF ACTION
### Retaliation in Violation of Section 1981

175.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

176.  Defendant violated Section 1981 by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in retaliatory actions against Plaintiff for engaging in protected activities, when complaining of the discriminatory, harassing, and disparate treatment she was subjected to by Defendant.

177.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

178. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A SIXTH CAUSE OF ACTION
### Retaliation in Violation of Title VII

179. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

180. Defendant violated Title VII by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in retaliatory actions against Plaintiff for engaging in protected activities, when complaining of the discriminatory, harassing, and disparate treatment she was subjected to by Defendant.

181. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

182. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A SEVENTH CAUSE OF ACTION
### Retaliation in Violation of the Executive Law § 296, *et seq.*

183. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

184. Defendant violated Executive Law §296, *et seq.* by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in retaliatory actions against Plaintiff for engaging in protected activities, when complaining of the discriminatory, harassing, and disparate treatment she was subjected to by Defendant.

185.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

186. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR AN EIGHTH CAUSE OF ACTION
### Retaliation in Violation of the Administrative Code § 8-107, *et seq*.

187.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

188.  Defendant violated Administrative Code § 8-107, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in retaliatory actions against Plaintiff for engaging in protected activities, when complaining of the discriminatory, harassing, and disparate treatment he was subjected to by Defendant.

189.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, damage to reputation, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

190. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

191.  As a result of the outrageous and blatantly retaliatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

## AS AND FOR A NINTH CAUSE OF ACTION
### Promoting a Hostile Work Environment in Violation of Section 1981

192.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

193.  In violation of Section 1981, Defendant promoted, allowed, encouraged, and maintained a hostile work environment for Plaintiff by Defendant's failure and/or refusal to prevent, cure or eliminate the discrimination and the abusive work conditions Plaintiff endured.

194.  As a result of Defendant' conduct, Plaintiff suffered, and continues to suffer severe emotional distress, damage to reputation, and other monetary damages connected with Defendant violations of Section 1981.

195.  Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A TENTH CAUSE OF ACTION
### Promoting a Hostile Work Environment in Violation of Title VII

196.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

197.  In violation of Title VII, Defendant promoted, allowed, encouraged, and maintained a hostile work environment for Plaintiff by Defendant's failure and/or refusal to prevent, cure or eliminate the discrimination and the abusive work conditions Plaintiff endured.

198.  As a result of Defendant' conduct, Plaintiff suffered, and continues to suffer severe emotional distress, damage to reputation, and other monetary damages connected with Defendant violations of Title VII.

199.  Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

**AS AND FOR AN ELEVENTH CAUSE OF ACTION**
**Promoting a Hostile Work Environment in Violation of the**
**Executive Law §§ 296, *et seq.***

200. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

201. In violation of Executive Law §§ 296, *et seq.*, Defendant promoted, allowed, encouraged, and maintained a hostile work environment for Plaintiff by Defendant's failure and/or refusal to prevent, cure or eliminate the discrimination and the abusive work conditions Plaintiff endured.

202. As a result of Defendant' conduct, Plaintiff suffered, and continues to suffer severe emotional distress, damage to reputation, and other monetary damages connected with Defendant violations of Executive Law §§ 296, *et seq.*

203. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

**AS AND FOR A TWELFTH CAUSE OF ACTION**
**Promoting a Hostile Work Environment in Violation of the**
**Administrative Code §§ 8-101, *et seq.***

204. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

205. In violation of Administrative Code §§ 8-101, *et seq.*, Defendant promoted, allowed, encouraged, and maintained a hostile work environment for Plaintiff by Defendant's failure and/or refusal to prevent, cure or eliminate the discrimination and the abusive work conditions Plaintiff endured.

206. As a result of Defendant' conduct, Plaintiff suffered, and continues to suffer severe emotional distress, damage to reputation, and other monetary damages connected with Defendant

34

violations of Administrative Code §§ 8-101, *et seq*.

207. As a result of Defendant' conduct, which has been extreme and outrageous, Plaintiff is entitled to punitive damages.

208. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A THIRTEENTH CAUSE OF ACTION
### Disability Discrimination in Violation of the ADA

209. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

210. Defendant violated the ADA by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's disability was the motivating, if not the only factor.

211. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

212. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A FOURTEENTH CAUSE OF ACTION
### Disability Discrimination in Violation of the
### Executive Law § 296, *et seq*.

213. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

214. Defendant violated Executive Law §296, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's disability was the motivating, if not the only factor.

215. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

216. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A FIFTEENTH CAUSE OF ACTION
### Disability Discrimination in Violation of the
### Administrative Code § 8-107, *et seq.*

217. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

218. Defendant violated Administrative Code § 8-107, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's disability was the motivating, if not the only factor.

219. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

220. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

221. As a result of the outrageous and blatantly discriminatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

## AS AND FOR A SIXTEENTH CAUSE OF ACTION
### Perceived Disability Discrimination in Violation of the ADA

222. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

223. Defendant violated the ADA by engaging in, perpetuating, and permitting supervisory

36

and decision-making employees to engage in discriminatory employment practices in which Plaintiff's perceived disability was the motivating, if not the only factor.

224. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

225. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

### AS AND FOR A SEVENTEENTH CAUSE OF ACTION
**Perceived Disability Discrimination in Violation of the
Executive Law § 296, *et seq*.**

226. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

227. Defendant violated Executive Law §296, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's perceived disability was the motivating, if not the only factor.

228. As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

229. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

### AS AND FOR AN EIGHTEENTH CAUSE OF ACTION
**Perceived Disability Discrimination in Violation of the
Administrative Code § 8-107, *et seq*.**

230. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

231.  Defendant violated Administrative Code § 8-107, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's perceived disability was the motivating, if not the only factor.

232.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

233. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

234.  As a result of the outrageous and blatantly discriminatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

## AS AND FOR A NINETEENTH CAUSE OF ACTION
### Age Discrimination in Violation of the ADEA

235.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

236. Defendant violated Executive Law §296, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's age was the motivating, if not the only factor.

237.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

238. Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A TWENTIETH CAUSE OF ACTION
**Age Discrimination in Violation of the**
**Executive Law § 296, *et seq*.**

239.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

240.  Defendant violated Executive Law §296, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's age was the motivating, if not the only factor.

241.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

242.  Plaintiff continues to suffer and to incur additional damages by reason of the foregoing.

## AS AND FOR A TWENTY-FIRST CAUSE OF ACTION
**Age Discrimination in Violation of the**
**Administrative Code § 8-107, *et seq*.**

243.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

244.  Defendant violated Administrative Code § 8-107, *et seq*. by engaging in, perpetuating, and permitting supervisory and decision-making employees to engage in discriminatory employment practices in which Plaintiff's age was the motivating, if not the only factor.

245.  As a result of Defendant's conduct, Plaintiff has suffered, and continues to suffer, loss of past and future wages and benefits, mental anguish, severe emotional distress, loss of enjoyment of life, and other monetary damages connected with Defendant's violations.

246. Plaintiff continues to suffer and to incur additional damages by reason of the

foregoing.

247.  As a result of the outrageous and blatantly discriminatory conduct of Defendant, with such conduct that contravenes public policies and statutes, Plaintiff is entitled to punitive damages.

### AS AND FOR A TWENTY-SECOND CAUSE OF ACTION
### Breach of Fiduciary Duties in Violation of 29 U.S.C. §§ 1104(a), 1132(a)(2)

248.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

249. Defendants were required to discharge their duties with respect to the ERISA plans solely in the interest of, and for the exclusive purpose of providing benefits to, the plans' participants and beneficiaries, defraying reasonable expenses of administering the plans, and acting with the care, skill, prudence, and diligence required by ERISA.

250. These duties required Defendants to prudently manage the EAP plan benefits, to ensure that the participants are offered a full and fair review or appeal opportunity, and not to be unlawfully, incorrectly or unjustly charged for EAP therapy sessions. In making decisions about the prescription-drug program, Defendants were required to consider all relevant factors and options under the circumstances, including alternative arrangements that were available to the EAP plan, the conflicts of interest of its vendors, whether the prices of EAP sessions under its contract were reasonable, to ensure participants had a full and fair review or appeal opportunity, and steps taken by other companies that successfully protected participants' rights.

251. Rather than prudently manage the EAP plan, Defendants agreed to make the plans and their beneficiaries pay high prices for EAP sessions, ceded control of the plan's formulary to conflicted third parties, failed to supervise those conflicted third parties or otherwise ensure that decisions were made in the best interests of the plan and its beneficiaries, failed to conduct adequate reviews of the plan, failed to steer beneficiaries to lower-cost options, failed to engage in

a prudent process for monitoring the plan, failed to enforce participants' rights under ERISA, and failed to take available steps that would have saved money to the plan and their beneficiaries.

252.  Defendants are personally liable under 29 U.S.C. § 1109(a) to make good to the plan any losses to the plan resulting from the breaches of fiduciary duties alleged in this Count and are subject to other equitable and remedial relief as appropriate.

253.  Pursuant to 29 U.S.C. § 1132(a)(2), Plaintiff is entitled to obtain relief under 29 U.S.C. § 1109(a), including: (i) to recover any losses of plan assets on behalf of the plan from any breaching fiduciaries; (ii) to recover profits or disgorgement of profits resulting from any such breaches; and (iii) other equitable or remedial relief as the Court deems appropriate, such as permanent injunctive relief and/or the removal of the current fiduciaries and appointment of an independent fiduciary.

### AS AND FOR A TWENTY-THIRD CAUSE OF ACTION
**Failure to Provide Plan Documents in Violation  of 29 U.S.C. § 1132(c)**

254.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

255.  Under 29 U.S.C. § 1132(c)(1), any plan administrator "who fails or refuses to comply with a request for any information which such administrator is required by [ERISA] to furnish to a participant or beneficiary … within 30 days after such request may in the court's discretion be personally liable to such participant or beneficiary in the amount of up to $100 a day from the date of such failure or refusal, and the court may in its discretion order such other relief as it deems proper." By regulation, the penalty has been increased to $110 per day. See 29 C.F.R. § 2575.502c-1.

256.  Defendants failed to comply with Plaintiff's request for the EAP plan documents or information, but instead concealed relevant and material information from Plaintiff, which ERISA

41

required Defendants to furnish to Plaintiff upon request.

257.  Pursuant to 29 U.S.C. § 1132(c)(1), the Defendants are liable to Plaintiff for a penalty to of $110 a day for each day since August 8, 2022 and to other relief the court deems proper.

### AS AND FOR A TWENTY-FOURTH CAUSE OF ACTION
**Breach of Fiduciary Duties in Violation of ERISA §§ 404 & 405**

258.  Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

259.  At all relevant times, Defendants Delta and TAC exercised discretionary authority and control over the administration and enforcement of the Delta Employee Welfare Benefit Plan, including the use of the Mandatory Employee Assistance Program ("EAP") as a condition of continued employment and return-to-duty status, rendering them ERISA fiduciaries as defined by 29 U.S.C. §1002(21)(A).

260.  Delta and TAC directly delegated discretionary decision-making authority to Aetna Resources for Living to conduct mandatory EAP intake, referral, documentation, and fitness-for-duty impact assessments.

261.  Under ERISA §404(a), Delta and TAC were obligated to prudently select, oversee, and monitor Aetna's administration of the Mandatory EAP and to implement safeguards preventing conflicts of interest, coercive referral practices, and financial self-dealing by EAP clinicians.

262.  Delta and TAC failed to monitor Aetna's administration of the Mandatory EAP, despite knowing or having reason to know that: Aetna clinicians were soliciting plan participants into private therapy relationships arising out of employer-mandated EAP sessions; Aetna clinicians were billing employees' private health insurance for mandatory employer-required evaluations; and Aetna clinicians were issuing fitness-for-duty recommendations while simultaneously treating

or soliciting the same individual, creating a prohibited dual-role conflict.

263. These failures constitute breaches of fiduciary duty and co-fiduciary liability under ERISA §405(a) because Delta and TAC knew or should have known of Aetna's breaches, yet failed to prevent, stop, correct, or remedy the violations.

264. As a direct result, Plaintiff suffered economic loss, interference with employment status, emotional and psychiatric harm, record stigma, and denial of ERISA-mandated fair review.

### AS AND FOR A TWENTY-FIFTH CAUSE OF ACTION
**Fraudulent Concealment of Employment Suspension and Improper Use of Plan Authority in Violation of ERISA §§404, 405, 406(b); ADA §12112(d)(4)**

265. Plaintiff repeats, reiterates and re-alleges all prior allegations as though fully set forth herein.

266. Plaintiff has obtained documentation from Aetna Resources for Living, acting under Delta's delegated authority, expressly confirming that Plaintiff was "suspended from work" as a result of a mandatory EAP referral administered in conjunction with a Short-Term Disability (STD) claim.

267. Defendant Delta intentionally misclassified this employment suspension as a "medical leave" and directed Plaintiff to file a Short-Term Disability claim, thereby concealing a disciplinary action within the guise of plan administration.

268. The use of the EAP and STD mechanisms in this manner constitutes a fraudulent concealment of a material employment fact and a breach of fiduciary duty of loyalty and prudence under ERISA §404(a), because the plan and its fiduciaries acted to protect the employer's disciplinary interests rather than the participant's rights.

269. Defendant Aetna's issuance of correspondence labeling the event a "suspension from work" confirms that the plan fiduciaries knowingly participated in a prohibited transaction under

ERISA §406(b) by using plan instruments to further the employer's employment-related objectives and to suppress evidence of an adverse action.

270. Defendant Delta, through its Administrative Committee (TAC), bears co-fiduciary liability under ERISA §405(a) for failing to monitor the delegated administrators, allowing them to manipulate benefit designations to conceal employment discipline and avoid statutory appeal procedures.

271. Defendants' conduct also constitutes retaliation and unlawful medical inquiry under ADA §12112(d)(4), as Plaintiff was compelled to undergo psychological evaluation and treatment unrelated to any verified job-related or safety-based concern, while the employer concealed the true disciplinary purpose.

272. The concealment deprived Plaintiff of procedural due process, full and fair review under ERISA §503, and the ability to contest the suspension, in violation of 29 C.F.R. §2560.503-1.

273. As a result of these violations, Plaintiff suffered loss of income, reputational injury, emotional distress, and career disruption, and has incurred out-of-pocket losses due to improper STD filings and EAP billings.

## **DEMAND FOR TRIAL BY JURY**

Pursuant to Rule 38(b) of the Federal Rules of Civil Procedure, Plaintiff demands a trial by jury on all questions of fact raised by this Complaint.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff prays that this Court:

A.    award Plaintiff equitable relief of back pay, front pay, salary, reinstatement and fringe benefits;

B.    award Plaintiff full compensation damages under Section 1981, Title VII, the ADA, the ADEA, the Executive Law of the State of New York, New York State Human Rights Law, § 296, *et seq.*, and the Administrative Code of the City of New York, New York City Human Rights Law, § 8-101, *et seq.*;

C.    award full liquidated and punitive damages as allowed under Section 1981, Title VII, the ADA, the ADEA, the Executive Law of the State of New York, New York State Human Rights Law, § 296, *et seq.*, and the Administrative Code of the City of New York, New York City Human Rights Law, § 8-101, *et seq.*;

D.    Find and declare that Defendants have breached their fiduciary duties as described above;

E.    Enjoin Defendants from any further violations of their ERISA fiduciary responsibilities, obligations, and duties;

F.    Award actual damages in the amount of any losses the plan suffered;

G.    Award statutory penalties to Plaintiff;

H.    award pre- and post-judgment interests;

I.    issue a declaratory judgment declaring that Defendant' actions are unlawful;

J.    enjoin Defendant from further discrimination, harassment and retaliation;

K.     award Plaintiff an amount to be determined at trial of lost compensation, back-pay, front-pay, bonuses, raises, emotional distress damages, and additional amounts such as liquidated damages;

L.     award Plaintiff such compensatory, prospective, exemplary and punitive damages as this Court deems appropriate, just and proper;

M.     award Plaintiff the cost of prosecuting this action and for reasonable attorneys' fees under the aforementioned statutes and 42 U.S.C. § 1988; and

N.     such other and further relief as this Court deems just and proper.

Dated: New York, New York
          November 19, 2025

Respectfully Submitted,

**LAW OFFICES OF
RUDY A. DERMESROPIAN, LLC**


By: ___/s/ Rudy A. Dermesropian_____
          Rudy A. Dermesropian (RD 8117)
          810 Seventh Avenue, Suite 405
          New York, NY 10019
          Telephone: (646) 586-9030
          Fax: (646) 586-9005

*Attorneys for Plaintiff*

Exh A



**U.S. EQUAL EMPLOYMENT OPPORTUNITY COMMISSION**
**New York District Office**

33 Whitehall Street, 5ᵗʰ Floor
New York, NY 10004-2112
Intake Information Group: (800) 669-4000
Intake Information Group TTY: (800) 669-6820
New York Direct Dial: (929) 506-5270
FAX (212) 336-3625
Website: www.eeoc.gov

## DETERMINATION AND NOTICE OF RIGHTS

(This Notice replaces EEOC FORMS 161 & 161-A)

**To:**   Alicia Mullice
186 Medway Drive
Midway GA 31320

**Re:**   Alicia Mullice v Delta Air Lines Inc

EEOC Charge Number: 16G-2023-00375

EEOC Representative and email:   **HERNAN.MORALES**
**State & Local Program Manager**
**HERNAN.MORALES@EEOC.GOV**

### DETERMINATION OF CHARGE

The EEOC issues the determination that substantial weight has been accorded to the findings of the state or local fair employment practices agency that investigated your charge.

### NOTICE OF YOUR RIGHT TO SUE

This is official notice from the EEOC of the dismissal of your charge and of your right to sue. If you choose to file a lawsuit against the respondent(s) on this charge under federal law, **your lawsuit must be filed WITHIN 90 DAYS of your receipt of this notice.** Receipt generally occurs on the date that you (or your representative) received this document. You should keep a record of the date you received this notice. Your right to sue based on this charge will be lost if you do not file a lawsuit in court within 90 days. (The time limit for filing a lawsuit based on a claim under state law may be different.)

Please retain this notice for your records.

On Behalf of the Commission:

Digitally Signed By:Arlean Nieto
08/26/2025
Arlean Nieto
Acting District Director

cc:   Delta Airlines Inc
c/o Corporation Service Company
80 State Street
Albany NY 12207

Morgan Lewis & Bockius
Attn: Ira G Rosenstein – Esq
101 Park Avenue
New York NY 10178-0060